### PIPE & CONTRACTORS' SUPPLY CO. v. FIRST NAT. BANK OF LITCH-FIELD.

(District Court, D. Connecticut. September 1, 1920.)

No. 2156.

1. **Sales ☞332—Seller held not warranted in reselling, reasonable time not having elapsed.**

   Where defendant bank sold plaintiff secondhand machinery, under an agreement providing for down payment, and for payment of the balance when the machinery was loaded on cars, the bank, under Gen. St. Conn. 1918, § 4727, providing that an unpaid seller may rescind the transfer of title and resume the property, provided the buyer has been in default for an unreasonable time, applicable because the sale occurred in Connecticut, was not warranted in rescinding the sale within a very few days after the machinery was loaded on cars furnished by plaintiff; it appearing that the bank recognized plaintiff's right to notice of loading by premature demand of payment, which showed the loading had not been completed, and that the resale was at a considerable advance.

2. **Sales ☞418(1)—Damages in action for breach.**

   Where a bank wrongfully rescinded the sale of secondhand material, reselling to another, *held*, that the buyer was entitled to recover the difference between the value of the machinery and the purchase price.

At Law. Action by the Pipe & Contractors' Supply Company against the First National Bank of Litchfield. Judgment for plaintiff.

Benjamin Slade, of New Haven, Conn., for plaintiff.

Lancaster & Foord, of Torrington, Conn., for defendant.

THOMAS, District Judge. This is a suit to recover damages for an alleged breach of contract. The parties have stipulated as follows:

"The above-entitled cause shall be tried by the Judge of the United States District Court, and submitted to him for determination and decision, and the parties hereto hereby waive the right of trial by jury."

The plaintiff is a New York corporation, and deals in new and secondhand pipe and fittings, engineers' supplies, boilers, engines, pumps, mine and mill supplies, derricks, wire ropes and blocks, cars, rails, hoisting engines, etc.

The defendant is a national bank, located at Litchfield, Conn., and was on the 25th of July, 1918, the owner of—

1,600 feet of 24-inch standard gauge 12-pound track.
1,600 feet of 2-inch pipe.
500 feet of 45-pound rail.
1 Leynes drill sharpener.
1 75 H. P. Titusville Iron Co. boiler, good for 100 pounds of steam.
1 Mogul oil engine, 4 H. P.
1 125-light generator, General Electric Co.
1 75-light generator, United States Electric Co.
1 air compressor, Ingersoll Rand, 350 cubic feet, steam 12x10, air 10x12, shop No. 25828, 120 pounds steam.
2,000 feet of 2½-inch pipe.
5 24-inch V-shaped cars.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

1 Universal crusher, 11x22, 35 H. P. engine, with buckets, screens, capacity 8 yards.
1 small 3-legged derrick.
300 feet ⅞-inch Ingersoll Rand hollow drill steel.
Miscellaneous lot of valves, drill steel, Jap hammers, steam drills, etc.,

all described in Plaintiff's Exhibit B and then located on what was known as the Wigwam reservoir job. All of said property was in good secondhand condition. On July 25, 1918, the parties to this suit entered into a written contract, which was marked "Plaintiff's Exhibit A," in evidence, and is as follows:

"The First National Bank of Litchfield, Conn.
"July 25, 1918.

"We hand you herewith check for $500, and agree to pay the further sum of $1,475 for the material now on the Wigwam reservoir job, named on attached list, when it is loaded on cars at the Litchfield station. This $1,975 includes the purchase price and moving same to station.
"Pipe & Contractors' Supply Co.
"M. Paltrewitz, Treas.

"Accepted: Charles H. Coit, Vice Pres.
"The First National Bank of Litchfield, Conn."

On the same day the plaintiff paid to the defendant the sum of $500, which the defendant accepted as a partial payment in accordance with said contract. On August 15, 1918, the defendant on its letter head wrote the plaintiff as follows:

"Pipe & Contractors' Supply Company, 3 Dover Street New York, N. Y.— Gentlemen: In reply to your letter, signed by Mr. D. Harris, August 5th, I beg to say, in regard to the material you purchased from us on July 25th, which is at the Wigwam reservoir dam, we expect the cars to be placed here on Monday next, August 19th, and the material will be on the ground ready to load. Mr. Parker expected to be at your office Tuesday or Wednesday; but, if he called there we have heard nothing from him in reference to his visit. Kindly acknowledge receipt of this letter. I understood that you wanted to have some one here when the stuff was ready to load.
"Very truly yours, Charles H. Coit, Vice President.
"CHC/DB."

On August 22, 1918, the defendant on its letter head wrote the plaintiff as follows:

"Pipe & Contractors' Supply Company, 3 Dover Street, New York, N. Y.— Gentlemen: In reference further to our letter of August 15th, I beg to say that much of the material is already loaded and we are assured the balance will all be on cars to-morrow afternoon, except crusher and boiler, which are on the ground and we feel sure it will be loaded on Saturday. Kindly give this your prompt attention and favor us with your check for $1,475, as agreed.
"Very truly yours, Charles H. Coit, Vice President.
"CHC/DB."

From this letter it is perfectly clear that, aside from the crusher and boiler even, not all of the balance of the material was loaded, so that when this notice was sent, demanding payment of the balance, the stone crusher and boiler, both very heavy and cumbersome articles, were not loaded, and some of the other material was not loaded; yet in this same letter the bank says, among other things, "Favor us with your check as agreed." "As agreed" refers to the contract. The contract says: "We agree to pay * * * $1,475 when it is loaded

on cars at Litchfield." The demand for payment was premature, because the contractual obligation of the bank was clear and specific, and it had not performed its part of the contract, but was demanding payment before its obligation to load was completed.

No notice of any kind was sent after August 15th, advising the plaintiff that it was all loaded on the cars at Litchfield. But upon the receipt of the letter of August 15th Mr. Paltrewitz, for the plaintiff, called up Mr. Coit on the telephone, and asked him to ship the goods when all were loaded on sight-draft with bill of lading; but Mr. Coit refused to do this, and on August 31st the defendant wrote the plaintiff as follows:

"The Pipe & Contractors' Supply Co., 3 Dover Street, New York, N. Y.— Gentlemen: Not having heard from you, in order to protect ourselves, we are obliged to sell the materials from the reservoir job, which we advised you was loaded on cars here, and inclose herewith our check for $414, being the balance of your check for $500, after deducting charges already incurred for demurrage on cars of $86. We regret that you were unable to avail yourself of the opportunity to handle this stuff, but we could not afford to hold it here any longer.

"Very truly yours,    Charles H. Coit, Vice President.
'CHC/DB.'"

On September 5th the plaintiff wrote the defendant as follows:

"First National Bank, Litchfield, Conn.—Gentlemen: We were in receipt of your letter of August 31st, 1918, accompanied by your check for $414.00 yesterday afternoon, and herewith return same to you. We are surprised at its contents. It is very evident that you have defaulted in your contract. We have always been ready, able, and willing to carry out our end of this agreement, and are presently ready, able, and willing to carry out same. What we desire is the merchandise and nothing else. We insist upon receiving this merchandise, or otherwise we shall be compelled to adopt other measures in the protection of our interest.

"Yours truly,    Pipe & Contractors' Supply Co.,
"BA.  Encl.    Per D. Harris, B. A."

The plaintiff arranged with the Railroad Administration for the cars to be used for the shipment and for a special permit. In accordance with this arrangement the cars were sent to Litchfield, and the record of the railroad company (Defendant's Exhibit 1) shows that one car arrived and was placed on August 19th, one on August 20th, and the third car on August 23d, all at noon. It will be recalled that the bank, in its letter of August 22d, said:

"We are assured the balance will all be on cars to-morrow afternoon, except crusher and boiler, which are on the ground, and we feel sure it will be loaded on Saturday"

—and the balance payment was requested. This was not only a demand made prematurely according to the terms of the contract, but was one made upon a guess, as at the time of writing that letter there was no car in Litchfield on which to complete the loading, as the third car did not arrive until noon of the day following the writing of the letter demanding balance of payment.

So also was the letter of August 31st prematurely written, so far as the statement respecting demurrage is concerned. Exhibit 2 discloses that the bill for demurrage was not mailed by the railroad company until August 31st at 5 p. m. from the Hudson Terminal Station, New

York City, and could not possibly have reached Litchfield until the morning of September 1st, and that the bill for demurrage was not paid until September 31st—according to Exhibit 1—when it appears that $4 was refunded, which would have made $82 for demurrage, and not $86, and the amount of the check due the plaintiff according to the defendant's theory of the matter was $418, and not $414, as was inclosed in the letter of August 31st.

Mr. Mills loaded the material. He testified that it was not all loaded until 8:30 p. m. on August 23d, and that he "staked up" the cars ready for movement on August 24th. While from the fact that the last car did not arrive until noon of the 23d I should be inclined to question the accuracy of Mills' recollection that he finished all loading at 8:30 p. m. on the same day as the car arrived, plus his financial interest in the resale of the property, yet, if we concede such to have been the fact, we find that the letter of August 22d was written two days earlier than the plaintiff was called upon to make payment to the defendant.

All the material included in the inventory, Exhibit B, was resold by the defendant to a third party for a greater amount than the price named in the contract. How much more, or for what price, the vice president and sole representative of the bank, in charge of this whole transaction, testified that he could not remember. The defendant sent no notice to the plaintiff, except that contained in its letters of August 22d and August 31st.

Upon these facts, the plaintiff alleges that the defendant failed, neglected, and refused to deliver the material inventoried to the plaintiff, and to perform its part of the contract as expressed in Exhibits A and B. The defendant alleges that it did tender delivery of the goods as called for by the contract by loading them when it did on the cars at Litchfield.

[1] Both parties admit that the contract is expressed in Exhibits A and B. Two questions are presented:

First. Did the defendant, who had the first work to do under the contract, perform its contractual obligations, and, if it did, what was its remedy or duty?

Second. Did the plaintiff violate its obligations under the contract?

That the defendant recognized a duty to notify the plaintiff is apparent from the fact that it sent two notices, on August 15th and August 22d. It was the duty of the defendant, under the contract, to load all of the material contained in Exhibit B, because it is expressly provided in the contract that the price agreed upon includes "purchase price and moving same to station" and "when it is loaded on cars at Litchfield station." It is not necessary to decide, as matter of law, whether the defendant was then bound to give notice of the loading, or whether it was the duty of the plaintiff to inform itself. On this subject the contract is silent. The defendant, however, evidently recognized that it was incumbent upon it to notify the plaintiff, and so sent its notice of August 22d, and possibly was acting under the inference suggested in section 4726 and section 4727, G. S. Conn.

It is not necessary to decide the question, because the whole case

turns upon broader principles. If we assume, as contended for by defendant, that the goods were in fact all loaded on the 23d, and "staked up" ready for movement on the 24th, under the statute law of Connecticut, and all decisions thereunder, the plaintiff was entitled to a reasonable time after the delivery was completed, as alleged, on the 24th, within which to make payment of the balance of the purchase price before the defendant could reclaim title and resell the goods. The arguments of counsel with reference to the right of the defendant to resell must be predicated upon a transfer of title from the defendant to the plaintiff at some time, because, in law, a right of resale is predicated upon a rescission of the transfer of title and a resuming by the original seller of the title in himself. Had the defendant the right to rescind the transfer of title and revest it in itself for the purpose of the resale under the evidence in this case? Section 4727 G. S. Conn. (Revision of 1918), and the evidence in this case, answer that question in the negative, for it provides, inter alia:

"Sec. 4727. *When and How the Seller may Rescind the Sale.* An unpaid seller having a right of lien or having stopped the goods in transitu may rescind the transfer of title and resume the property in the goods, provided, he expressly reserved the right to do so in case the buyer should make default, or provided, the buyer has been in default in the payment of the price an unreasonable time."

In the case at bar there was nothing in the contract which would bring the defendant within the first clause quoted above, and the only remaining way it could rescind the sale and resume title in the goods for purposes of a resale would be in case "the buyer has been in default in the payment of the price an unreasonable time."

The time elapsing between August 22d, the date of the letter, or August 24th, the date of the loading, and the letter of August 31st, advising the plaintiff of a resale, is short—too short to be held unreasonable under all the conditions, circumstances, and the evidence in the case. It was unreasonable of the bank to act so quickly. The plaintiff was entitled to a reasonable time within which to make the balance payment, and it did not get it. The motive for the haste on the part of the bank was not the demurrage charges on the cars, for which the plaintiff was alone liable, but was due to its eagerness to avail itself of the larger price received by it from the new customer, to whom it resold the goods. Therefore the conclusion is imperative that on August 31st the bank could not rescind the sale, and revest title in itself for purposes of a resale, and thus bring itself within the second clause of the statute just quoted.

It is unnecessary to discuss and decide all the claims made, but sections 4727 and 4717 of the General Statutes and the rules therein laid down compel a decision here adverse to the defendant. This whole subject-matter is ably discussed by Professor Williston in his work on Sales, in chapter XVI, pages 923 and 966, and without quoting at length it is sufficient to say that his discussion of the rules and the cases cited are in accord with the conclusion herein expressed.

[2] The only remaining question is the amount of damages the plaintiff is entitled to recover. The defendant offered no testimony

whatever as to the value in August, 1918, of the material listed in Exhibit B. Two officers of the plaintiff company detailed the prices of each article at length, and testified to a total valuation of $12,135, and $11,375, respectively. A disinterested witness from Massachusetts, and an expert well qualified, fixed the value at $9,875, while still another expert from New York fixed the value at $9,300.

I therefore am justified in finding that the fair market value in August, 1918, of the material listed in Exhibit B was $9,500. From this sum there should be deducted the purchase price, $1,975, so that the difference, $7,525, represents the actual loss sustained by the plaintiff, for which amount, together with interest at 6 per cent. from September 1, 1918, judgment may be entered for the plaintiff with costs.

The day the trial of this case began the defendant deposited with the clerk of the court $500 in cash. The plaintiff claimed this was evidence against the defendant. Whether it was or not it is unnecessary to say. The defendant claimed its right to deposit it with the clerk, as it was money it neither wanted nor claimed the right to hold, as it was the amount paid to it by the plaintiff on July 25, 1918, at the time the contract was signed. The clerk may return this $500 so deposited to the defendant, less any commission which a federal statute may impose, if any.

The counterclaim filed by defendant warrants no consideration.

Judgment accordingly.